## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| BILL COOKE, individually and on behalf of others similarly situated, | ) ) |
| *Plaintiffs*, | ) ) |
| v. | ) ) |
| DIRECTV, INC., a Delaware Corporation, | ) ) ) JURY DEMANDED |
| *Defendant*. | ) |

## <u>CLASS ACTION COMPLAINT</u>

1.   Aimed at protecting consumer privacy, the Telephone Consumer Protection Act,

47 U.S.C. § 227 ("TCPA") prohibits the use of "automatic telephone dialing systems" to call cellular telephones.  The TCPA bans nonemergency "robocalls," *i.e.*, telephone calls placed through an automatic telephone dialer system, to cellular telephones unless the recipient expressly consents to receive those calls.

2.   Plaintiff Bill Cooke ("Plaintiff") received an unattended autodialed call on his cellular telephone, which was placed by or on behalf of DIRECTV, Inc. The calls were made as part of a robodialing campaign, the purpose of which was to advertise DIRECTV's products and/or services to a large number of potential customers in a short period of time.

3.      As explained herein, DIRECTV is well aware of the TCPA's prohibitions against autodialed and prerecorded voice calls to cell phones, but systematically uses these devices as part of calling campaigns to gain customers, in spite of this knowledge.

4.      Plaintiff thus brings this action against DIRECTV under the TCPA on behalf of himself and others similarly situated.  Plaintiff seeks statutory damages for himself and the class and an injunction prohibiting DIRECTV from making impermissible robocalls in the future.

## JURISDICTION AND VENUE

5.      The Court has federal question subject matter jurisdiction over these TCPA claims. *Mims v. Arrow Financial Services, LLC*, 132 S.Ct. 740 (2012).

6.      Venue is proper because a substantial portion of the events complained of occurred in this District.

## PARTIES

7.      Plaintiff Bill Cooke is an individual who resides in Florida.

8.      DIRECTV, Inc. ("DIRECTV") is a corporation organized and existing under the laws of the State of Delaware.

9.      At all relevant times, DIRECTV conducted business in Florida, solicited business in Florida, engaged in a persistent course of conduct in Florida, and has derived substantial revenue from services rendered in Florida.

## THE FACTUAL BASIS OF THE CLAIMS

### DIRECTV'S AUTHORIZED DEALER PROGRAM

10.     DIRECTV markets and distributes its goods and services through a distribution network of authorized dealers.

11.     DIRECTV allows its authorized dealers to market DIRECTV's products and services, including via telemarketing.

12.     DIRECTV allows its authorized dealers to market its products and services using the DirectTV trademark and trade name.

13.     DIRECTV allows its authorized dealers to hold themselves out to the public as acting on behalf of DIRECTV.

14.     DIRECTV has the ability, through this authorization, to oversee the conduct of these marketers.

15.     DIRECTV has failed to adequately exercise its ability to oversee the conduct of these marketers, which has allowed them to market the DIRECTV product in a manner that violates the TCPA.

16.     DIRECTTV incentivizes its authorized dealers as they are compensated based on new customer activations.

17.     In order to be a DIRECTV authorized dealer, an entity must commit to selling a minimum amount of contracts to DIRECTV monthly, or they are terminated from the program.

18.     Additionally, DIRECTV dealers have the ability to enter consumer information into DIRECTV's internal systems, or to provide consumer information to DIRECTV.

19.     Through consumer complaints and a number of the lawsuits, DIRECTV was aware that its marketing agents were acting in a manner that violated federal telemarketing law, and were doing so using the DIRECTV name.

20.     Despite this fact, DIRECTV continued to accept the marketing benefits of the authorized dealers that it knew, or should have known, were violating federal telemarketing law using the DIRECTV name while marketing DIRECTV products.

21.     By failing to act after having knowledge of the conduct, DIRECTV ratified illegal telemarketing conducted on its behalf by its authorized dealers.

22.     Consumers contacted by DIRECTV's authorized dealers have to enter into separate agreements with DIRECTV in order to obtain DIRECTV programming.

23.     All customer service was thereafter provided by DIRECTV and not by the third parties authorized to market on DIRECTV's behalf who initially contacted the consumer through pre-recorded telemarketing.

<u>"SPAM" TEXT MESSAGES PROVIDE TELEMARKETERS WITH INSTANT
COMMUNICATION TO CONSUMERS TO PROMOTE GOODS AND
SERVICES</u>

24.     In recent years, marketers stymied by federal laws limiting solicitation

by telephone, facsimile machine, and email have increasingly looked to alternative

technologies through which to send bulk solicitations to consumers easily and

cheaply.

25.     One of the newest methods of bulk marketing is to advertise through

text messages sent to mobile phones.

26.     Unlike faxes and unanswered phone calls, a text message allows

virtually instantaneous communication with the recipient, almost anywhere in the

world, day or night.  Many cell phones immediately alert the recipient of new text

messages.  Consumers frequently use text messaging to stay in close contact with

business colleagues and associates, family members, and friends.  Text messaging

is also used by schools, police departments, fire departments, and emergency

medical services across the country.

27.     The instantaneous nature of text message communication makes it

very appealing to telemarketers—and very annoying to consumers subjected to

spam text messages.

28.     And unlike other forms of advertisement, spam texts can cost its

recipients money.  Many wireless customers have telephone plans that charge a fee

for each text message, or that permit a limited number of text messages per month.

29.     Spam text messages are a burgeoning phenomenon.  One authority estimates that Americans received more than four billion spam texts in 2011—more than double the number sent just two years earlier.

### THE CALL TO BILL COOKE

30.     On May 30, 2012, Plaintiff Bill Cooke received a text message on his cell phone at 3:43 pm local time.

31.     The text message identified itself as coming from the CID number 786-863-9086.

32.     The content of the text message read:

INFO: 1810-545-4890 *DIRECTV
*RESIDENCIAL / COMERCIAL DESDE $29.99 X MES HASTA 4 TVs.
*SERVICIO HD FREE * LLAMA YA 1810-545-4890 INFO.

33.     The use of a call that delivers a generic text message is indicative of the use of automated equipment during the call, and particularly the use on an automated telephone dialing system to dial such a call.

34.     It is wholly inconsistent with common teleservices practices, and with common sense, to make a call of an automated nature by delivering a generic message unless an automated device also dialed the call.

35.     Automated dialing systems are higher efficiency calling mechanisms than the use of live persons and manual dialing.  This is particularly true in practice of "lead generation" where the automated systems are used as a screening mechanism to contact large numbers of consumers.

36.     The automated telephone dialing system used by the entity that sent this message was one or more devices that had the capacity to dial numbers from a list without human intervention, and when paired with certain software, had the capacity to store or produce numbers produced by a random or sequential number generator, and dial those numbers at random, in sequential order, or from a database of numbers.

37.     This call was made to promote DIRECTV goods and services.

38.     Plaintiff Bill Cooke has never provided his cell phone number to DIRECTV.

39.     Plaintiff Bill Cooke did not consent to receive telemarketing calls from DIRECTTV on his cell phone.

40.     Bill Cooke is not a customer of DIRECTV and has never been a customer of DIRECTV.

### THE LEGAL BASIS OF THE CLAIMS

41.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy . . . ." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227). Specifically, in enacting the TCPA, Congress outlawed telemarketing via unsolicited automated or pre-recorded telephone calls ("Robocalls"), finding:

7

> Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy.
>
> . . . .
>
> Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call . . . , is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

*Id.* § 2(10) and (12); *Mims v. Arrow Financial Services, Inc.*, 132 S.Ct. 740 (Jan. 18, 2012).

## THE TCPA PROHIBITS ROBOCALLS TO CELL PHONES UNLESS THE RECIPIENT EXPRESSLY CONSENTS TO RECEIVE THE CALLS

42.     While the TCPA imposed restrictions on a wide set of telemarketing practices, its strictest provisions apply to telemarketing by automatic telephone dialing system.  *See* 47 U.S.C. § 227(b)(1).

43.     An automatic telephone dialing system (sometimes called "autodialer") is "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator to dial the numbers[,]" and has the capacity to dial such numbers.  *Id.* § 227(a)(1).  The term extends to equipment that has the capacity to dial numbers without human intervention.  *See In The Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C.R. 14014, 14093 (2003).

44.     With the limited exception of calls made for emergency purposes, the TCPA bans *all* calls to cell phones placed through an autodialer, regardless of

whether they solicit the sale of goods or services, unless the recipient of the call

provides "prior express consent" to receive the calls.  47 U.S.C. § 227(b); 47

C.F.R. § 64.1200(a)(1).

45.    "Prior express consent" exists where a consumer has (a) clearly stated

that the telemarketer may call, and (b) clearly expressed an understanding that the

telemarketer's subsequent call will be made for the purpose of encouraging the

purchase of goods or services. *See In The Matter of Rules and Regulations*

*Implementing the Telephone Consumer Protection Act of 1991*, 10 F.C.C.R. 12391,

12396, para. 11 (1995).

## THE TCPA IMPOSES VICARIOUS LIABILITY ON THIRD-PARTIES WHO DO NOT PHYSICALLY DIAL THE CALLS

46.    Under the TCPA, as interpreted by the FCC, a person or entity can be

liable for calls made on its behalf even if that person or entity did not directly dial

those calls.

47.    The FCC has explained that its "rules generally establish that the party

on whose behalf a solicitation is made bears ultimate responsibility for any

violations." *See* Rules and Regulations Implementing the Telephone Consumer

Protection Act of 1991, Memorandum and Order, 10 FCC Rcd. 12391, 12397, ¶ 13

(1995).

48.    In 2008, the FCC reiterated that "a company on whose behalf a

telephone solicitation is made bears the responsibility for any violations." *See*

Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 Request of ACA International for Clarification and Declaratory Ruling, CG 02-278, 23 F.C.C.R. 559 at ¶10 (Jan. 4, 2008) (specifically recognizing "on behalf of" liability in the context of a Robocall sent to a consumer by a third party on another entity's behalf under 47 U.S.C. 227(b)) .

49.     In May of 2013, the FCC reinforced this issue.  *See In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, --- FCC Rcd. --- (F.C.C. May 9, 2013) (hereinafter "2013 FCC Ruling Order") (clarifying that "a seller … may be vicariously liable under federal common law agency-related principles for violations of either section 227(b) or 227(c) committed by telemarketers that initiate calls to market its products or services."). The FCC rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* n.107.

50.     The 2013 FCC Order further explained:

> To provide guidance in this area, we find that the following are illustrative examples of evidence that may demonstrate that the telemarketer is the seller's authorized representative with apparent authority to make the seller vicariously liable for the telemarketer's section 227(b) violations. For example, apparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services

or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct. At a minimum, evidence of these kinds of relationships – which consumers may acquire through discovery, if they are not independently privy to such information – should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent.

[ ] In sum, under our current rules and administrative precedent interpreting and implementing  sections 227(b) and 227(c), we do not think that an action taken for the benefit of a seller by a third-party retailer, without more, is sufficient to trigger the liability of a seller under section either section 227(c) or section 227(b). However, we see no reason that a seller should not be liable under those provisions for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods or services. In that circumstance, the seller has the ability, through its authorization, to oversee the conduct of its telemarketers, even if that power to supervise is unexercised. In the case of either actions to enforce section 227(b) or actions to enforce do-not-call restrictions under section 227(c), we stress that nothing in this order requires a consumer to provide proof – at the time it files its complaint – that the seller should be held vicariously liable for the offending call.

*Id.* at ¶¶ 46-47).  A copy of this Order is attached as <u>Exhibit 1</u>.

51.     Accordingly, it is undeniably clear, that an entity can be liable under the TCPA for a call made on its behalf even if the entity did not directly place the call under a number of theories, including vicarious liability.  Under those circumstances, the entity is properly deemed to have initiated the call through the person or entity that actually placed the call.

52.     In addition to the standard articulated above, DIRECTV is well aware of its legal responsibility to ensure that calls placed by their agents comply with applicable telemarketing law, even if DIRECTV employees did not physically dial the calls.

53.     On December 12, 2005, the United States of America filed a Complaint seeking Civil Penalties and Injunctive Relief against DIRECTV.  A copy of the Complaint is attached as Exhibit 2.  In that Complaint, the United States alleged:

   a. *Defendant* DIRECTV markets its *programming* through a variety of methods, including telemarketing. *Id.* at ¶ 34;
   b. Defendant DIRECTV entered into oral or written contractual agreements with telemarketing entities. *Id.* at ¶ 35;
   c. Beginning on or about October 17, 2003, the telemarketing Defendants have directly, or through intermediaries, placed outbound telephone calls to consumers' telephone numbers on the National Do Not Call Registry. *Id.* at ¶ 39;
   d. DIRECTV provided a customer contact list to a telemarketing defendant that, contained the telephone numbers of consumers who were on the National Do Not Call Registry. *Id.* at ¶ 41;
   e. Defendant DIRECTV provides substantial assistance to telemarketers by offering to pay or paying hourly rates and commissions for marketing services, allowing telemarketers to market DIRECTV goods or services, entering into contracts with consumers contacted by

the telemarketers, providing services to consumers contacted by the telemarketers, and collecting money from consumers contacted by the telemarketers. *Id.* at ¶ 46;

54.     The day after the Complaint was filed, December 13, 2005, the United States and DIRECTV announced that they had agreed on a Stipulated Judgment and Order for Permanent Injunction against DIRECTV.  In connection with that Order, DIRECTV agreed to pay $5,335,000.00.  A copy of that Order is attached as Exhibit 3 ("2005 FTC Order")

55.     In that Order, DIRECTV:

   a.  Agreed to be permanently restrained and enjoined from engaging in violations of the Telemarketing Sales Rule, including, but not limited to, initiating any outbound telephone calls to a person when that person previously has stated to DIRECTV that they did not wish to receive an outbound telephone call made by or on behalf of DIRECTV.  *Id.* at ¶ I(A)(1);
   b.  Agreed to be permanently restrained and enjoined from failing to monitor outbound telemarketing campaigns conducted by its authorized dealers. *Id.* at ¶ II(D)(1)-(2);
   c.  Agreed to be permanently restrained and enjoined from providing any monetary compensation for any telemarketing related sales or activities, including but not limited to hourly rates of pay or commissions, to any authorized dealer after DIRECTV knows or reasonably should have known failed to comply with the Telemarketing Sales Rule. *Id.* at ¶ II(E)(ii);
   d.  Cease doing business with any authorized dealer that failed to comply with the Telemarketing Sales Rule. *Id.* at ¶ II(F);
   e.  Develop a system for receiving and promptly investigating all consumer complaints related to violations by any authorized dealers that have failed to comply with the Telemarketing Sales Rule. *Id.* at ¶ IV(A)-(B);
   f.  Waived all their rights to challenge or contest the validity of the Order. *Id.* at ¶ 5.

56.     Unfortunately, the 2005 FTC Order did not stop DIRECTV and their authorized dealers from engaging in illegal telemarketing practices.

57.     On April 16, 2009, the United States of America filed a second Complaint seeking Civil Penalties and Injunctive Relief against DIRECTV.  A copy of the Complaint is attached as Exhibit 4.

58.     A number of the allegations made in the 2009 Complaint are identical to complaints made in the 2005 Complaint.

59.     On April 23, 2009, the United States and DIRECTV announced that they had agreed on a Stipulated Judgment and Order for Permanent Injunction against DIRECTV.  In connection with that Order, DIRECTV agreed to pay $2,310,000.  A copy of that Order is attached as Exhibit 5 ("2009 FTC Order").

60.     In the 2009 FTC Order, DIRECTV agreed:

    a.  To be permanently restrained and enjoined from engaging in violations of the Telemarketing Sales Rule, including, but not limited to, initiating any outbound telephone calls to a person when that person previously has stated to DIRECTV that they did not wish to receive an outbound telephone call made by or on behalf of DIRECTV.  *Id.* at ¶ I(A)(1);

    b.  To be permanently restrained and enjoined from initiating any outbound telephone call that delivers a prerecorded message, other than a prerecorded message permitted for compliance. ¶ I(C);

    c.  Agreed to be permanently restrained and enjoined from failing to monitor outbound telemarketing campaigns conducted by its authorized dealers. *Id.* at ¶ II(D)(1)-(2);

    d.  to be permanently restrained and enjoined from providing any monetary compensation for any telemarketing related sales or activities, including but not limited to hourly rates of pay or commissions, to any authorized dealer after DIRECTV knows or

reasonably should have known failed to comply with the Telemarketing Sales Rule. *Id.* at ¶ II(E)(ii);

e.  Cease doing business with any authorized dealer that failed to comply with the Telemarketing Sales Rule. *Id.* at ¶ II(F);

f.  Develop a system for receiving and promptly investigating all consumer complaints related to violations by any authorized dealers that have failed to comply with the Telemarketing Sales Rule. *Id.* at ¶ IV(A)-(B);

g.  Waived all their rights to challenge or contest the validity of the

Order. *Id.* at ¶ 5.

h.  Agreed to maintain all documents in connection with this Order for a period of eight years. *Id.* at ¶ IX.

61.     In advance of the FCC's issuance of the 2013 FCC Ruling Order,

DIRECTV submitted comments advocating for limiting its liability for the acts of

its authorized dealers.

62.     The FCC rejected DIRECTV's attempt to limit its vicarious liability

for the actions of its authorized dealers in the 2013 FCC Ruling Order:

> DIRECTV asserts that such liability would force sellers to "pull out of the independent retailer channel in order to avoid liability, and consumers would lose local contacts and competitive choices between retailers." DIRECTV also contends that if third-party telemarketers conclude that liability for their unlawful calls can be shifted to sellers, they will have little incentive to comply with TCPA restrictions and violations will increase.
> …
> 44. We find these concerns to be misplaced. Sellers can simultaneously employ third-party telemarketers and protect their legitimate commercial interests by exercising reasonable diligence in selecting and monitoring reputable telemarketers and by including indemnification clauses in their contracts with those entities. Moreover, we disagree that imposing seller liability will increase unlawful telemarketing by reducing the incentives of third-party telemarketers to comply with TCPA restrictions. To the contrary,

15

overall unlawful activities should be reduced, as sellers will have an incentive to carefully choose their telemarketers to ensure compliance and to force consistent violators out of the marketplace.

2013 FCC Ruling Order at ¶¶ 43-44.

## COUNT I – TCPA

63.    Plaintiff incorporates all previous paragraphs of this complaint.

64.    It is a violation of the TCPA, 47 U.S.C. §227(b) to call a person's cellular telephone using an automatic telephone dialing system. The TCPA also specifically prohibits the use of an unsolicited pre-recorded phone message to advertise the sale of goods and services.  47 U.S.C. § 227(b)(1)(B); 47 C.F.R. § 64.1200.

65.    DIRECTV, or some person on its behalf, initiated a call to plaintiff and others' cellular telephones, using an automatic telephone dialing system and/or an artificial or prerecorded voice.

66.    Plaintiff and the class are entitled to have their rights, status and legal relations under the TCPA relating to defendant's telemarketing to cell phones using an automatic dialing system and artificial or prerecorded voice.

67.    The defendant's calls were negligent, or alternatively, they were willful.  47 U.S.C. §312(f)(1).

## CLASS ALLEGATIONS

68.    Plaintiff brings Count I on behalf of a class, which consists of:

All persons nationwide who defendant or some person on its behalf called on their cell phone using a device that has the capacity to dial numbers without human intervention and/or an artificial or prerecorded voice, where the called party had not previously provided consent to receive such call, where any call was made between and including a date four years prior to the filing of this action, ongoing.

69.     Plaintiff is a member of this class.

70.     The class is so numerous that joinder is impracticable. Upon information and belief, as well as common experience of the size of automated dialing campaigns, there are more than one thousand persons in the class.

71.     Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting any individual member of the class, including plaintiff. Such questions common to the Class include, but are not limited to:

>       a.      Whether the calls that are the subject of this lawsuit were made using an "automatic telephone dialing system" as proscribed by the TCPA and applicable FCC regulations and orders;
>
>       b.      Whether the violation was negligent or willful.

72.     Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has no interests that might conflict with the interests of the class. Plaintiff is interested in pursuing his claims vigorously, and has retained counsel competent and experienced in class and complex litigation.

73.     Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit

a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.

74.     No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

75.     Defendant has acted on grounds generally applicable to the class, thereby making relief appropriate with respect to the class as a whole.  Prosecution of separate actions by individual members of the class, should they realize their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct.

76.     The identity of the class is likely readily identifiable from defendant's records, or the records of other person(s) involved with making the calls.

77.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of himself and the class and against defendants that provides the following relief:

    a.     Statutory damages of $500 per violation, and up to $1,500 per violation if proven to be willful;

b.   A permanent injunction prohibiting defendant from violating the TCPA in the future through calling cell phones using an automatic telephone dialing system and/or a prerecorded voice message;

c.   A declaration that defendant used an automatic telephone dialing system and artificial or prerecorded voice, and violated the TCPA in using such for calls to the cell phones of plaintiff and the class; and

d.   Any other relief the Court finds just and proper.

## **JURY DEMAND**

Plaintiff demands trial by jury.

Dated this 26th day of June, 2013.

Respectfully submitted,


*Scott D. Owens*
Scott D. Owens
SCOTT D. OWENS, P.A.
664 E. Hallandale Beach Blvd.
Hallandale, FL 33009
Telephone: (954) 589-0588
Facsimile: (954) 337-0666
scott@scottdowens.com

Alexander H. Burke
BURKE LAW OFFICES, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
*Subject to Admission Pro Hac Vice*

Edward A. Broderick
Anthony I. Paronich
Broderick Law, P.C.
125 Summer St., Suite 1030
Boston, MA  02110
(617) 738-7080
*Subject to Admission Pro Hac Vice*

Matthew P. McCue
The Law Office of Matthew P. McCue
1 South Ave., Third Floor
Natick, MA 01760
(508) 655-1415
*Subject to Admission Pro Hac Vice*

## <u>DOCUMENT PRESERVATION DEMAND</u>

Plaintiff hereby demands that the defendant take affirmative steps to preserve all recordings, data, emails, recordings, phone records, dialer records, documents and all other tangible things that relate to the allegations herein, plaintiff or the putative class members, or the making of telephone calls, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with plaintiff or the putative class members, and any account or number or symbol relating to any of them.  These materials are very likely relevant to the litigation of this claim.  If defendant is aware of any third party that has possession, custody or control of any such materials, plaintiff demands that defendant request that such third party also take steps to preserve the materials.  This demand shall not narrow the scope of any independent document preservation duties of the defendant.

*Scott D. Owens*

Scott D. Owens
SCOTT D. OWENS, P.A.
664 E. Hallandale Beach Blvd.
Hallandale, FL 33009
Telephone: (954) 589-0588
Facsimile: (954) 337-0666
scott@scottdowens.com